A. W. ROBINSON v. H. AND T. CENTRAL RAILWAY Co.

1. CHARGE OF COURT, LOSS OF.—In the absence of the charge of the court in the record, from its loss or otherwise, it will be presumed that the law applicable to the case was correctly given, and that the verdict was in accordance with the law as charged.
2. FACT CASE.—See facts held insufficient to support an action for damages against a railway company, from the negligence of one of its employes, in an action brought by another of its employes.
3. NEGLIGENCE.—An employe of a railroad company, knowing of a change in the arrangement for running the train, and not objecting to it, and where such arrangement is made by the consent and for the convenience of the employes, cannot complain of the increased risk occasioned by such arrangement.
4. NEGLIGENCE OF FELLOW–SERVANT.—A servant cannot recover damages from the master, for an injury sustained by reason of the negligence of a fellow-servant.
5. SAME.—The negligence of a servant of a railway company of one grade is as much one of the risks of the business as that of another;

and it seems impossible, therefore, to hold that the servant contracts to run the risks of negligent acts or omissions on the part of one class of servants, and not those of another class.

APPEAL from Harris. Tried below before the Hon. James Masterson.

February 15, 1873, Robinson sued the railway company for damages, for an injury to his foot, caused by the wheel of one of the cars of the defendant running over it, while he was acting as brakeman, in employ of defendant, on a freight train.

The defendant pleaded a general denial, and contributory negligence on the part of plaintiff.

On the trial, the plaintiff testified as follows; "At the time I got my foot hurt, I was in employ of the defendant as brakeman on freight train of defendant, running from Houston to Hearne. I have been so employed since some time in December next before. P. T. Atkinson was the regular conductor on the train, but on the 16th of February, 1872, he remained at Houston, and Wade H. Robinson acted as conductor on that trip. He was also a brakeman on the train with me. We left Houston about $4\frac{1}{2}$ o'clock in the morning, and there were about twenty to twenty-five cars in the train. For trains of this length, the usual number of men was, one engineer, a fireman, conductor, and four brakemen. On this trip there was no brakeman to take the place of Wade H. Robertson; he acted both as brakeman and conductor. We were going north, and my station was on the rear car of the train, the caboose, and Robertson was stationed ahead of me several cars. As we approached Navasota, he called me to him, and said he was a little behind time; had a car to set out at Navasota, and wanted to lose as little time as possible, so as to meet the down train at Millican on time. He told me he would put on the brakes in front, so as to take up the slack of the train, and for me to go down between two cars and uncouple them. There were no hand holes or brake rods between the two cars that I was to go down be-

tween.   I went down and pulled the pin, and then the train separated.   It was then running at the rate of five or six miles an hour.   When the cars separated, I had nothing to hold on to, and I jumped out to one side.   In doing this, I stumbled and fell.   There was no brakeman at the rear end of the train.   Wade H. Robertson motioned to me to get on the rear part of the train that had been cut off, and stop it. I understood his motion, or what he meant, and there being no side ladder on the first car, I ran back to the side ladder on the second car, and caught hold of it, and tried to spring up, but the construction train had dumped some fresh sand along there, near the track, and it, being soft, gave way under me, so that I could not spring so as to get a foot-hold. I saw that if I hung on to the train, I would be taken between the car and platform, and crushed, so I tried to throw myself away from the car with my hands and body, and, as I let go, I fell with my right leg across the rail and under the car, and, as I got it out, the car wheel caught and crushed my big toe and the one next to it.   I got up and sat down on a pile of lumber.   After setting out the car, the men on the train came back to me, and cut off my boot and took me to the depot station.   This occurred between 11 and 12 o'clock, of the 16th of February, 1872, at Navasota.   I never had known Wade H. Robertson to act as conductor of a train before, nor have I known of it since.   He failed to put on the brakes so as to keep the cars from separating.   I would not have gone down to cut the train, but for his promise to put on the brakes, and hold up the cars, and not let them separate.   When they separated, I had nothing to hold upon, and nothing to stand on, except the draw-head, or bumper, and had to jump, or fall under the train.   It was necessary for me to remount the part of the train cut off, and stop it. We usually work by signs, as the cars make so much noise, we cannot converse.   I was laid up about six weeks with my foot, then went on crutches awhile, and it was about four months, from the time I was hurt, before I was able to work much.

I am not more than half the man I was before; I can't get around so well; and can't run as fast as a setting hen. Very often I can't wear a shoe on that foot. Since I got able to work, I have been doing first one thing and then another. I first tried working in the Eagle Iron Works, but had to quit, because I could not stand the lifting, and it caused me great pain. I was getting fifty-five dollars a month on the railroad, and while disabled, it paid twenty-three dollars a month board. I am now engaged in buying hides and wool, in Galveston. Drs. Massie and Poulson attended me, and made three amputations of my two toes before the wound got well. Gangrene at one time set in, and made my wound very troublesome.

On cross-examination, he said: "I am now buying hides and wool for T. P. Robinson, of Galveston, and am getting sixty dollars a month; next winter I expect to get one hundred and twenty-five a month. I knew, the night before we left Houston, that Atkinson, the regular conductor, was not going on the train next day, and that Wade H. Robertson was to act as conductor in his place. I had heard that Robertson had been a conductor, but did not have any knowledge of the fact. I did not know whether any one was going in Robertson's place as brakeman or not. It is usual, when one man wants to lay off for a trip, for some other one to do the work of himself and the one that lays over, so as to keep his wages going on. It is usual for hands to jump on and off the cars when in motion. A man cannot stand on the drawhead of a car, when in motion, without something to hold to—a hand-hold or brake-beam at the end of the car. I knew the risk, when down between the cars, to cut the train, and would not have gone down but for the promise of Robertson, that he would put on the brakes and hold the train together. I don't know why the sand had been placed along the side of the track, but supposed it was to be used in raising the track."

Re-examined for himself, he said: "The sand along the

track, where the accident occurred, had been dumped off by the car load, and, I suppose, was from one to two feet deep, for fifty or sixty yards before getting to Navasota station. Wade H. Robertson is now at work for defendant, as brakeman. He has been gone for a time. He worked three or four weeks for defendant, after I got hurt, so he told me. I had not seen him since, until yesterday."

James Terry, next sworn, says: " There is a space, of sixteen to eighteen inches, between box-cars, but not room for a man to stand on the draw-head, or bumper, while the cars are in motion, and after they have separated, without a brake-beam or hand-hold to cling to, unless he is tall enough to reach the top of the car. A competent conductor would not order a man down to cut the train while in motion, at the rate of five or six miles an hour, and when he had no brake-beams or hand-holds. I have done it myself, when I would not require another to do it, because I would sometimes take risks which I would not require others to take. When I did it, I could reach and hold to the top of the car. When brakemen know that a train is to be cut in this way, they usually provide a rope, with which to draw the pin to the top of the car."

A. W. Spencer, next sworn, says: I had been running trains on the Central Railroad about nine years, until I quit, about a year ago. The conductor has charge of the train, and the brakemen are required to obey him. He employs the train hands, and discharges them, when they do not suit him. No ordinary man could stand between two box cars, when in motion, and, after the train had separated, without hand-hold or brake-beam, to hold to. If the cars separate while he is between them, he must get out the best way he can. A competent conductor would not order a man down between two box cars to cut the train when in motion, and with nothing to hold to, and allow the train to separate while he was there. Train hands often catch the ladder on the side of the cars, and get on the train. Sand placed on the

side of the track, I should think, would obstruct them some in doing so.

William B. Freer, being sworn, for defendant, testified: I was engineer on the freight train on which the plaintiff was, at the time he got hurt. It was at Navasota; the speed had been checked, and the train was moving, at the time, at the rate of four to five miles an hour. It went to the north end of the switch, and set out a car, and returned. When I saw the plaintiff was hurt, I went to him, and asked if he was hurt. He said he was trying to get on the train that had been cut off, and missed his hold, and the car ran over his foot. We cut off his boot, saw his toes were smashed, and took him to the station house, and a doctor was sent for, and soon after, the train went on to Millican. The steam shovel had dumped sand along the side of the track there, for purpose of raising the road—it had been dumped off in the usual way. Sand is often so placed along the track for repairing; it was lying along about the end of the ties.

On cross-examination, he said: I had not noticed the sand there before. It was fresh, and was some fifteen yards from the platform, and some twenty feet from the small one. There was about the usual number of cars on that train that day—say, twenty to twenty-five. When the train was cut, some five or six cars were left behind. There is sand along the track for repairs, and it sometimes remains a month before it is used.

J. A. Nelson, for defendant: I was brakeman on the train with plaintiff, and was on the train when he got hurt, but did not see the accident. My station was on a car nearest the engine; plaintiff was at the rear of the train. Ridgley and Wade H. Robertson were the other brakemen between us, the latter acting also as conductor on that trip. The night before we left Houston, I knew that Atkinson, the regular conductor, would not go on the train next day, and also knew that Wade H. Robertson would act as conductor

on the trip.   He did act as conductor and brakeman on that trip.   I had never seen him act as conductor before, nor since, but had seen his recommendation as such from some other road.   The train that day was about the usual length, say, twenty to twenty-five cars.   It is usual to have a brakeman on the rear end of the train, in going into stations, in shifting, and in uncoupling.   As we were going into Navasota that day, I saw the plaintiff and Wade H. Robertson standing at the place. at which the train was cut.   The brakes were at the opposite ends of the cars from where they were standing.   I saw the plaintiff go down, after which he was out of my sight; the train was separated, and I could not see what had happened to plaintiff; but I saw Wade H. Robertson jump off the forward division, and get on the portion cut off, and stop it.   We then set out the car, to be left at Navasota, and backed down the cars, cut off, when I found the plaintiff was injured.   We took him to the station, and a doctor was sent for, but I don't remember who sent. I have seen Wade H. Robertson drink several times; never saw him drunk but once, and that was after the plaintiff got hurt.   On that day I know he was as sober as I was, and I never drank a drop in my life.

On cross-examination, he said: T. P. Atkinson was the regular conductor of that train; there was no one on the train that day to take the place of Wade H. Robertson.   He acted both as brakeman and conductor.   Don't think I ever before saw a train cut in two while in motion, without a brakeman on the rear end of the train; and don't think I ever saw before, a man go down to cut a train, while in motion, without brake-rods or hand-holds; and never saw a train cut while in motion, and separate, with a man between the parts, either before or since that time.   Wade H. Robertson did not give any signal to put on brakes, that I saw, when the plaintiff went down to cut the train, nor did I see any signal given to go ahead.   I did not set any brakes, nor did I see any one else set any, until we stopped at the north

end of the switch. I am now conductor of freight train for defendant. At the place where plaintiff was hurt, some fresh sand had been dumped on the side of the road, along about the end of the ties. I suppose it came within two or three feet of the rail, and, being soft, would impede one some in getting on the car. The momentum of the cars cut off, I would think, would have taken them past the station, and by the north end of the switch, if they had not been stopped.

W. H. Vaughan, for defendant: I am in employ of defendant, as assistant superintendent of freight, and have been so employed over two years. I have been railroading about fourteen years. The evening before the day on which plaintiff was injured, Mr. Atkinson, the regular conductor of the train, wished permission to lay over the next trip, and recommended Wade H. Robertson, one of his brakemen, to act as conductor of his train that trip. Atkinson is a good conductor. I did not know anything of Robertson as a conductor, and never saw any letter of recommendation of him as such; but Atkinson having recommended him, I gave him permission to lay over the next trip, and put Wade H. Robertson in charge of the train for that trip. Robertson is now a brakeman on the northern division of defendant's road.

Wade H. Robertson, for defendant: I was brakeman on the train on which the plaintiff got hurt, and on that day was also acting as conductor, Mr. Atkinson, the regular conductor, having remained over at Houston. I was conductor on freight train on the Pacific railroad, in Missouri, and brought letters of recommendation as such to this State from Mr. Redmond, the assistant superintendent of that road. I have also served as brakeman and as baggage master on that road. Before we got to Navasota, I told plaintiff we were a little behind time, and had a car to set out at Navasota, and I wanted to get to Millican on time, and I wanted him to go down and cut the train, and I would set the brake and hold up the train. He went down, and I set my brake, and did not give any signal to go ahead. He pulled the pin, and the

cars separated, and when he jumped off I halloed, and motioned to him to get on the rear train and stop it. I saw him fail to get on, and I then jumped off and got on it and stopped it. The train was moving at the rate of five or six miles an hour. Had seen cars uncoupled in that way before, but never knew them to separate. Can't tell what caused the separation.

On cross-examination, he said: The train was moving at the rate of five or six miles an hour. There was no brakeman on the rear end of the train after plaintiff went down to cut the train. If one had been on the rear end when the train was cut, he could have stopped it, and it would not have been necessary for the man, after cutting the train, to remount it. I ordered plaintiff to go down and cut the train, and told him I would hold the train together while he did so. I put on one brake. In answer to plaintiff's question, how he (witness) expected the plaintiff to get out, if the cars separated, witness said: I expected him to get out the best way he could. I never saw a train separate in that way before or since, and don't know what caused it. I had not acted as conductor on this road before that time, nor have I since, and did not receive conductor's pay for that trip. There was no one on the train to fill my place as brakeman.

There was a verdict for defendant, and plaintiff appealed. The charge of the court is not in the record.

*Winch & Schaefer*, for appellant, cited, Fifield v. N. R. R., 42 N. H., 240; Shearm. & Red., on Neg., 90, 91; C. & N. R. R. Co. v. Sweet, 45 Ill., 197; C. & N. R. R. Co. v. Jackson, 55 Ill., 492; Harper v. I. & S. L. R. R. Co., 47 Mo., 567; Rohback v. P. R. R. Co. 43 Mo., 187; McDematt v. P. R. R. Co., 30 Mo., 115; Gibson v. P. R. R. Co., 46 Mo., 163; Moss v. P. R. R. Co., 49 Mo., 167; L. M. R. Co. v. Stevens, 20 Ohio, (O.S.,) 424; C. C. & C. R. R., Co. v. Keary, 3 Ohio, 201; Laler v. C. B. & Q. R. R. Co., 56 Ill., 401.

*Baker & Botts*, for appellee.

MOORE, ASSOCIATE JUSTICE.—This suit was brought by appellant, to recover damages for an injury sustained by him while acting as brakeman on appellee's train.

The charge of the court below is not in the record, and having been lost, cannot, it is said, be supplied. In the absence of anything to raise or justify a contrary inference, it must be presumed that the law applicable to the facts of the case was correctly given to the jury, and that their verdict was in accordance with the law as charged. It might, consequently, be well held, as appellee's counsel urges, that this presumption would justify, if it does not require, the affirmance of the judgment. Aside from this presumption in support of the judgment, we see nothing in the record to induce the conclusion that the verdict was not fully supported by the evidence, or that any error occurred in the trial of the case of which appellant has any just cause of complaint. If the injury he sustained was, in fact, occasioned by the fresh sand placed along the side of the track, there is no evidence tending to show that it was placed there by appellee, or by its officers having the general charge and management of its affairs, and whose acts are to be looked upon and regarded as the acts of appellee. If the sand was placed along the track by a mere fellow-servant, in the employ of appellee, appellant has no just cause of complaint. If its deposit along the side of the track was improper, unless it was done by the immediate or direct order of appellee, or had been improperly suffered by appellee to remain after having been notified of its being there, or after, by the exercise of reasonable diligence, it should have been known, it can only be regarded as the act of a fellow-servant, for which no action can be maintained by appellant against the company.

These remarks are equally applicable to the right insisted on by appellant, to recover, because one of the brakemen was put in charge of the train as conductor, and that too without an additional brakeman being put in his place. To this assumption it may be answered, that it was not shown that

the party put in charge of the train was not a fit and compe-
tent person to be entrusted with the discharge of the duties
committed to him.   The evidence, aside from the manage-
ment of the train while acting as conductor on this occasion,
seems reasonably sufficient to warrant the belief that he was
fully competent and qualified to discharge the duties of con-
ductor of the train for the trip. „ But if he was not, appellant
was fully cognizant of the arrangement, and made no objec-
tion whatever to it.   (Skip v. Eastern Counties R. R. Co., 9
Exch., 223; S. C., 24 Law and Eq., 396; Williams v. Clough,
3 H. and N., 260; Mad Run v. Barber, 5 Ohio St., 562.)

Such arrangements seem not to have been unusual with
the train hands, and to have been for their mutual accommo-
dation and advantage, and with their general concurrence
and assent.

It is urged that the general rule which holds that a servant
cannot recover damages from the master for an injury sus-
tained by reason of the negligence of a fellow-servant, is not
applicable in this case, because the injury to appellant resulted
from the negligence of the conductor, for the time being, to
whose direction and control appellant was subjected.   For a
time, as says Judge Cooley, (Southern Law Review, April,
1876, p. 110,) a strong disposition was manifested in some of
the courts to hold to this view.   We, however, agree with him,
" that the negligence of a servant of one grade is as much one
of the risks of the business, as the negligence of another;
and it seems impossible, therefore, to hold that the servant
contracts to run the risks of negligent acts or omission on
the part of one class of servants and not those of another
class."

This, it is believed, is now recognized as the sounder and
best-approved rule, both on reason and authority.   (Priestly
v. Fowler, 3 Mees. & W., 1; Coon v. S. & U. R. R., 5 N. Y.,
492; Warner v. Erie R. R. Co., 39 N. Y., 468; Columbus v.
Arnold, 31 Ind., 174; Chicago v. Murphy, 53 Ill., 336; 6
Cush., 75; 32 Vt., 473; 20 Md., 212; 23 Penn., 384.)

There is no error in the judgment, and it is therefore affirmed.

AFFIRMED.