Gulf, Colorado & Santa Fe Railway Co. v. W. H. and Mary Mayo.

Delivered June 22, 1896.

**Negligence—Assumed Risks—Railway Switchman.**
For evidence held not to warrant a verdict against a railway company for the death of an employe (switchman) killed while coupling cars that were defective, because showing that the employe knew of the defective condition, and that the company was not negligent in relation to such defect, see the opinion.

Appeal from Johnson. Tried below before Hon. J. M. Hall.

*J. W. Terry,* for appellant.—Where an employe knows exactly what precautions are being taken for his safety and none others are, or where by the exercise of ordinary diligence he could be apprised of such facts, then by continuing in the service he assumes the risk of injury in the business as so conducted, and can not complain that other or different precautions were not taken for his safety. There is no evidence that it was usual, customary or practicable to adopt any other or different method, and hence there was no evidence to warrant a finding of negligence on the part of the defendant company. While negligence is a question of fact, there must be evidence to support the finding. So, where an employe knows the method in which the business is being conducted, the precautions or absence of precautions taken, by continuing in the service he assumes the risk of injury from the business as so conducted. Watson v. Railway, 58 Texas, 434; Robinson v. Railway, 46 Texas, 540; Railway v. French, 86 Texas, 96; Railway v. Strycharski, 26 S. W. Rep., 253; Railway v. Somers, 71 Texas, 700; 78 Texas, 439; Railway v. Brentford, 79 Texas, 700; Rogers v. Railway, 76 Texas, 502; Latremonille v. Railway, 48 Am. & Eng. R. R. Cas., 265; Hallehan v. Railway, 2 Am. & Eng. R. R. Cas., 117; O'Rourke v. Railway, 18 Id., 19; Pennsylvania Co. v. Stoelke, 8 Id., 523; Cypher v. Railway (Pa.), 24 Atl. Rep., 225; Renfro v. Railway, 86 Mo., 302; Railway v. Doyle, 49 Texas, 198; Railway v. Fowler, 56 Texas, 460; Railway v. Whitmore, 58 Texas, 286; Railway v. McNamara, 59 Texas, 257; Railway v. Conrad, 62 Texas, 628-629; Railway v. McCarthy, 64 Texas, 632; Railway v. Bradford, 66 Texas, 734-735; Railway v. Crenshaw, 71 Texas, 340; Railway v. Williams, 72 Texas, 340; Railway v. Lehmberg, 75 Texas, 67; Railway v. Lemon, 83 Texas, 146; Railway v. Johnson, 83 Texas, 630; Quick v. Iron Co. (Minn.), 50 N. W. Rep., 244; Coombes v. Railway (Mass.), 30 N. E. Rep., 1140; Rush

v. Railway, 28 Am. & Eng. R. R. Cas., 487-490; Railway v. Mc-
Cormick, 74 Ind., 440; 5 Am. & Eng. R. R. Cas., 477; Railway v.
Risdon's Admr., 87 Va., 335; 48 Am. & Eng. R. R. Cas., 246-247;
Gleason v. Railway (Mass.), 34 N. E. Rep., 79; Ragon v. Railway, 97
Mich., 265; 59 Am. & Eng. R. R. Cas., 207-208; Railway v. Seley,
125 U. S., 145; 59 Am. & Eng. R. R. Cas., 218; Clark v. Railway, 29
Pac. Rep., 1140; Wilson v. Railway (Minn.), 31 Am. & Eng. R. R.
Cas., 244; Murphy v. Am. Rubber Co. (Mass.), 34 N. E. Rep., 268;
Lovejoy v. Railway, 126 Mass., 79; Gibson v. Railway, 63 N. Y., 449;
De Forest v. Jewett, 88 N. Y., 264; O'Neil v. Railway (Ind.), 31 N.
E. Rep., 669; Bailey's Master's Liability for Injuries to Servants, 180-
181.

W. F. Ramsey and P. B. Ward, for appellees.—In this case there
was sufficient evidence to show, and the jury must have found, and did
find, on a proper submission of the issue to them, that the defendant
company knew, before the injury to Harvey Mayo, that the drawhead
on the car causing his injury was defective and dangerous; that, with
this knowledge, it permitted said car to remain on said track without its
being repaired, for more than twenty-four hours, and failed to notify
deceased of the hidden danger in same; that said car was operated and
used for the purpose of hauling sand; that at the time it was first dis-
covered to be in bad condition, it was only a few hundred feet from the
machine shops and round-house of appellant, and that it could easily
have been repaired; that the defect was one not likely to have been dis-
covered by the deceased, and one which he did not, in fact, know; that
by the act of placing a bad order card on said car the particular defects
were not shown to deceased, and that if he had looked at the drawhead,
while the car was in motion, he could not and would not have discov-
ered the defect which caused the injury resulting in his death; and all
the evidence shows a gross negligence and criminal indifference on the
part of the appellant. The jury were justified in finding the appellant
negligent, and such finding is abundantly sustained by the testimony.
Railway v. Galbraith, 66 Texas, 526; Railway v. White, 76 Texas, 102;
Railway v. O'Hare, 64 Texas, 600; Railway v. Lempe, 59 Texas, 19.

LIGHTFOOT, CHIEF JUSTICE.—The following statement of the case
by appellant, with some slight additions, and also the statement of the
evidence, are both concurred in by appellees as correct, and we adopt
the same:

"This is a suit by appellees for damages for the death of their son,
Harvey A. Mayo, on April 30, 1895. Verdict and judgment was ren-
dered for the plaintiffs for $2500. Defendant's motion for a new trial
being overruled, appeal has been duly prosecuted to this court.

"The petition shows that Harvey A. Mayo was killed while attempt-
ing to couple two cars at Cleburne, Texas, on February 22, 1893, on
account of the fact that the cars came too close together, crushing him

between them. It charges that the cause of the cars so crowding together was the fact that the draft timbers of one of the cars, placed on each side of the drawhead for the purpose of keeping the drawhead in proper position, were broken, and the carrier iron which extended from one draft timber to the other for the purpose of supporting and holding up the drawhead in its proper place, was loose and out of repair, and also the lug strap that was supporting part of the drawhead was loose and out of repair; by reason of which defects, when the other cars struck the drawhead of such car, the same was forced in, permitting the two cars to come so close together as to crush the said Mayo. The petition alleges that such defects existed by reason of the negligence of the defendant. It was also alleged that the agents and servants of appellant, other than the deceased, knew of the damaged condition of the drawhead in question before the injury, and that they carelessly and negligently permitted the defective car to remain on the track and negligently failed to advise him of its condition, and permitted the same to be used for the purpose of hauling sand from one track to another. That appellant had a machine shop in its yards at Cleburne for the purpose of repairing defective cars and machinery.

Defendant answered by general denial, and the following special answer: "And for further answer defendant says that when said Mayo accepted employment from it as a switchman it became a part and parcel of his duty to couple and uncouple cars out of repair, as well as other cars, and by accepting its employment as a switchman, he assumed all the risks incident thereto. And defendant avers that it has its car inspectors, whose duty it is to inspect each and every car that comes into its yards, and if they find any car out of repair and dangerous to handle, it is the duty of said inspectors to tack a red card on said car, with the words 'Bad Order,' printed on said card, which card is notice to all employes, including especially switchmen, that there is something wrong with the same, and it is then their duty to handle said car in a cautious manner; and that it is the duty of all switchmen before they go to handle a car that has been brought into the yard to notice said car to see if there is such a card on same, and if there is, then it is their duty to look out for the defect; and such is the rule this defendant has adopted to notify its switchmen of defective cars, so that they may be able to protect themselves against injuries; and that this was the rule of defendant when said Mayo went into its service, and that said Mayo had full knowledge of said rule; and defendant avers that the said defective car mentioned in plaintiff's petition had placed on it one of said cards with the 'Bad Order' printed thereon; and that said Mayo knew that fact before he attempted to couple said car; could have known it by the use of ordinary care. The defendant avers that said Mayo knew of said defect in said car, or could have known of such by the use of ordinary care, and that it was through his own carelessness and rashness that he was caught between the said two cars and crushed to death."

Plaintiffs' evidence.—Mary Mayo testified: "I have lived in John-

son County, Missouri, for twenty years. I am the wife of W. H. Mayo, and mother of Harvey A. Mayo. He was twenty-two years old at his death, and unmarried. My age is forty-three years. Harvey's health was good; he was able to perform hard labor, and was of industrious habits; he had no disease that I know of." She testified to facts showing longevity of various members of her family, which indicated that in her opinion Harvey might have lived to an old age. "Harvey was at home about two months before his death. He gave me money sometimes. I can't say what per cent he gave me, but on or near pay day he would give me ten or fifteen dollars. After he left for Texas, he never sent me any money. I cannot remember when he gave me money, as he always gave it to me in person, except two times; the second time was in November, 1892. The reason I remember it is because it is the last he ever gave me."

W. H. Mayo, father of the deceased, testified that the deceased enjoyed good health, was able to perform hard labor, a good worker, sound in body and mind, and that he was temperate, frugal and industrious. That he would have lived to be an old man according to the ages of his grand parents. "He had been away from home about three months when he was killed. He made my home his home before he left. He did not send me any money from Cleburne, Texas. He gave me seven dollars in September, 1892."

Charles Gibson testified that Mayo was killed by being crushed between the cars he was trying to couple. "After he was taken out, I noticed one of the drawheads broken and knocked down until it struck the ground and fell out. I did not notice whether it was an old break or a fresh one. I think the cars came back at the rate of five or six miles per hour. I noticed a 'Bad order' card on the car that killed Mayo; this card was about six or seven feet from the end of the car, tacked on the side of the car where Mayo was; the card was about three inches square; these cards are put on cars that are supposed to be in bad order; these cards do not indicate particularly what part of the car is out of repair. I could not tell what part of the car needed repair from the card. I would know that some part of the car was in bad order. The card was red, and on the same side of the car Mayo was on. I am not a switchman. The cars he was attempting to couple were flat cars."

P. McDaniel testified that he reached the scene of the accident shortly after it occurred. "I noticed the drawhehd on the north car; it was broken and the timber shattered. It was considerably shattered and pitched under the car like it had been done with some force; the timbers to which the drawhead was fastened were splintered. It was the timbers that were shattered and pitched under the car; it was pine timbers; part of it was old and part new. The timbers pitched round there were all newly broken—splintered up like it had been done with force. I think it had been broken at that spot. I cannot tell what force it would have taken to have bursted the timbers; they were on a level track. I

do not know how fast the cars were going when they come together; the drawhead is the cast iron that holds the links; the iron is not broken; it was the timber that holds these things."

B. Wright testified that he was coroner, and visited the scene of the accident before the deceased was removed. "He was mashed in the heart about the size of my hand, and there was a little bruise on his back, but not to amount to much. I judge the mash on his heart was what killed him. I examined the cars with reference to the drawheads; they were said to be in bad condition; I am not a judge. The coupling was knocked down when I got there; I examined the cars and one of the drawheads were down—the one on the south car, but the north end of it; one end of it was down; the carry iron was broken; the other end of the drawhead was up all right."

John Stanton testified: "I was about ten car lengths from Mayo when he was killed. I got there about five minutes afterward. When I got there he was standing between two flat cars dead. One of the drawheads was knocked down on the ground and the drawbars caught Mayo. The drawbar is made of cast iron. The drawbar was let down because the carry iron that holds it up was gone. The carry iron is placed under the drawbar across the two draft timbers. The carry iron was off, so that when struck there was nothing to support it and a little jar knocked it on the ground. I was working with the gang with Mayo just before the accident; I uncoupled the car that mashed Mayo, and the drawhead almost caught my thumb, and I said, 'If you are going to use that any more, you had better be careful.' There was no engine attached to the car when Mayo was killed. The car was being pushed about two miles per hour. When the car was uncoupled the defect was not perceptible; it was apparently all right. The drawhead remained at its place; when the cars came together the drawhead was knocked down; if the coupling had been made Mayo would not have been killed; but he missed the coupling and that caused the carry iron to drop on the ground. I have been railroading about fifteen years and switching about twelve years. It is the duty of a switchman to couple and uncouple bad order cars as well as good cars. Bad order cars are designated by tacking a red tag on the side of it, marked 'Bad order.' That is the way these were designated when Mayo went to work on the yard, and they were so designated when he was killed. They never had any other way of designating them. The track where Mayo was killed was level, with a slight curve; it was necessary in building it to curve it, though I am not a track man or a civil engineer. At the time Mayo was killed the engine was not attached to either section of the cars. The line of cars north were stationary, and he was killed by the rolling of the south section of the cars against the north section, which were stationary. The cars that were moved were on what is called the lead-track, and were pulled down to the switch, and the switch thrown and such cars as were wanted cut out, and the switch engine set the cars in motion and threw them on the switch. The cars were shoved a little

up grade, and the force the switch engine gave them was for the purpose of making the coupling. My attention was called to the defective drawhead before I went in between the cars to uncouple them. It was all right apparently; I never noticed the red tag on the car before I went in to uncouple them. When I uncoupled the car it came near pinching my thumb. At that time the car was on the lead track, on the east side of the main track. At the time I uncoupled the car Mayo was at the other end of the car, four or five feet off on the opposite side of the track from me, and I said, 'If you want to use that car any more, be careful of it; if you want to make a coupling, look out for it.' Mayo made no reply, and I don't know whether he heard me or not. I meant that he might get his fingers pinched and might be drawn under the car. If he had made the coupling he would not have been killed. If both of the couplings had been all right and in good repair, there would have been no danger if he had not made the coupling. There is a good deal of noise there in the yards all the time, necessarily so when the switch engine is running. It was about ten minutes before Mayo was killed that I had the conversation with him about the drawhead. Immediately after the conversation I pulled these cars up and kicked them on the track where he got killed. He went from there to the other track to make the coupling; I threw the switch. He did not make the coupling on the cars that remained on the track where I had the conversation with him; he made the coupling to the other car on the other track to which he went. I followed the car south and he went across to the track to make the coupling. He did not make the coupling to the car that I was uncoupling at the time I had the conversation with him; that was the one that killed him. At the time he was killed he was attempting to make the coupling with the car that I uncoupled a few minutes before when I had the conversation with him. Mayo was caught between the pockets on the ends of the cars which were about four inches square; if he had not got between the pockets there would have been only six inches' space for him. Mayo was in the regular discharge of his duties. When a car is marked 'Bad order,' it is the duty of a switchman to couple and uncouple them, the same as if they were in good condition. The pockets on the cars are about one and a half feet from the end and they extend out about four inches. There was no carry iron attached to the car that the drawhead was broken on. The lug strap supports the drawhead. I suppose that there was one on this car. There are no words on these cars except 'Bad order,' and the date. There is nothing to indicate what part of the car is in bad order. You could not tell from reading the card whether it was the drawhead or the roof that was in bad order. We were moving these cars to get the sand that was on them where the stockmen could unload them."

N. P. Cothran testified. He detailed the manner of the accident and the cause thereof substantially as did the other witnesses. "There was a 'Bad order' card, four inches square, printed in large

letters, nailed on the right hand side of the car, the side the switchman switches on, and the side on which the engineer receives signals." The following question was asked the witness: "Do you know whether or not Mayo had any knowledge of the condition of the car outside of this card?" To which the witness answered: "We were talking about it when the car was on the main stock lead. He took hold of the link and and tried to pull it from between the draft timbers to loosen the pin so he could get the pin out. I spoke to him and said he could not get it out. We afterwards picked up that car and set it on the middle stock track. It was cut out with four other cars and put on the stock track where it was to be unloaded. When Mayo went in to couple them, he was caught and killed. It was not necessary for the car to be coupled. If he attempted to couple the car, it was not necessary for him to go between the cars to do so; the car should have been chained up, the car placed there and stopped; the chain should have been put on it and the men could have gotten under and moved the cars without danger to themselves. C. A. Jarrett was foreman of the gang under my instructions. I was present at the time and would be considered foreman. Jarrett's duty was to make up trains, handle trains, and oversee the crew of the switch engine. He has no power to employ or discharge switch hands. I have been working in defendant's yard at Cleburne since March, 1892, in the capacity of night and day yard master. 'Bad order' cars are designated in the yards by placing bad order cards on them. The words 'Bad order' are on the cards. Mr. Jarrett was foreman of the switch crew; he has the privilege of giving orders to men and they have to act under him; at that time when I gave orders to do work he sees that it is done. When he goes out in the yard he is foreman, and he tells the switchmen what to do, and they do do it, unless they see that there is danger to themselves. He is in charge of the men in my absence. I have been on the road since June, 1891. I do not know exactly how long I had known Mayo. He was brakeman on the road, but left the service and was re-employed as switchman. He had been under my supervision for a couple of months. The drawhead was standing up so that it would be impossible to make the coupling in the position that it was. That was perfectly apparent to a casual observer. An experienced switchman would have detected it. An experienced switchman could not help observing it. I saw Mayo looking at that particular drawhead, I suppose between ten and thirty minutes before his death. Mayo, Stanton and Warner were there doing some switch work. They were moving the cars from the stock lead to the middle track. They took the cars out on the middle track. This car was not uncoupled at all; it moved out. It was the north car. I do not know as a fact that Stanton uncoupled this car and told Mayo to be careful; I did not hear him. I know this car was not coupled when we pushed them up into the stock lead, and I don't know whether they were not moved any more until they were moved back on the lead track or not; they might possibly have been

moved between that time and the time Mayo was killed. I was up near the stock pens. Stanton did not hear me tell Mayo that he could not uncouple that car. I told Mayo he could not pull that drawhead pin out. Stanton at that time was on the gang, but I don't know whether he was in hearing distance or not. The words 'Bad order' was on the card and possibly there may have been the car initials, the number of the car or something to that effect. I don't know that there was anything else. My depositions have been taken in this case, and my answers deliberately given, and that is my signature. It may be stated in the depositions that the words 'Bad order for drawhead work' was on the card. If it was on it, it was put on it by the inspectors. I know the words 'Bad order' was on the card. I don't know that there was anything else. Sometimes the defects are given on the bad order card and sometimes they are not; as a general rule there is nothing else on it. Sometimes the defects are written on the bottom of the card. That is for the benefit of the car inspector. He can look at that card and see what repairs are needed. The car inspector puts it on for the benefit of the car repairer. The cards are put on the cars for everybody concerned to know that it is in bad order. I stated that a card had on it 'Bad order for drawhead work'. If that statement had not been true, I would not have made it. I do not think it possible to be mistaken about a fact when I go and look at a thing—not that soon. I do not remember the date the depositions were taken and don't know how soon after this accident. I don't know whether it was thirty or sixty days, or one or 100 days. I do mean to tell the jury that I can't remember a detail about my business 100 days after it occurred. All I remember now was the words 'Bad order' on the card. I cannot remember the other things written. I believe I made the following answer to the following interrogatory: 'Interrogatory. With what was the cars between which he was killed loaded? Had you personally seen and examined these defects before Mayo was killed, or simply did you notice the bad order card on them, and in this way know that they were in bad order? Could you tell, and did you know from seeing the bad order card or mark on it what the specific defect was—whether the drawhead was in bad shape, the floor out of order or some other defect?"

"I believe I made the following answer to the above interrogatory: 'They were loaded with sand. I had personally seen and examined the defects in both of the cars before Mayo was killed. There was only one of them in bad order. It was marked 'Bad order for drawhead work.' I could therefore tell that drawhead work was needed, but could not tell how much nor to what extent? The above answer is correct, or I would not have made it. I am as certain of the fact as any other, though I don't remember about the words written on the car, except the words 'bad order.' I do not remember whether I testified before in this trial that I told Mayo that the drawhead could not be pulled

out, or not. I may have been asked to state all I knew about the killing."

Here plaintiffs' counsel read to the witness the following interrogatory and answer from his depositions: "Question: If in answer to any of the above interrogatories you say that Harvey Mayo was caught between two cars on the 22d day of February, 1893, while attempting to couple some cars, state whether any of the cars, or any part of them were out of repair. State now in what respect, and if you say you knew at the time he went to couple the same, state how you knew it, and state whether such defects were open and in full view of every one, and state whether such cars were marked in such a way as to warn any one that the cars were in bad order. If so, state in what way the cars were so marked." Is not this the answer you gave: "The drawhead of the car G. C. 467 was out of order; the draft timbers and follow plates were given away, which allowed the drawhead to pass under the wood of the car. Harvey Mayo knew it at the time he went to make the coupling while the car was on the stock track lead, and he went in and tried to pull the pin out; the defects were in plain view of any one."

To which the witness testified: "I believe I made the answer just read. My memory was fresher. I might have stated that I did not know whether it was a bad order car or not. I perhaps remember the contents of the card better than now. I was something like 100 yards from Mayo when he was killed. I did not see him try to make the coupling. I was not quite active, that is no further than my duty required, in getting witnesses before the coroner's inquest to show that the man was killed by his own negligence. We have a regular statement to make out, and it is my duty to make out that statement. No, it is not a fact that I have acted as a special agent for the company in this case in no respect. All the witnesses are summoned here, and are not here at my request. I did not ask to be relieved from the rule for the purpose of assisting; the attorneys did ask that I be permitted to remain, but they did not do so at my request; they did not say anything to me about it, and I did not know anything about it until they stated it to the court. I got my orders to release witnesses that were summoned to court from superintendent or station master. There were other parties present when I spoke to Mayo about the drawhead, but I do not know whether they were in my immediate presence or not, or whether they heard me or not. I do not know whether Stanton coupled the car after I left or not."

C. A. Jarrett for plaintiff, testified: "I reside in Cleburne, Texas. I was switchman in the yards of the defendant at Cleburne, Texas, on February 22, 1893. I knew Harvey A. Mayo. I was in the yards at the time he was killed. I was eight or ten car lengths, which is 300 yards from him when he was killed, which would be two or three hundred yards. I was foreman of the engine crew. I did not have any power to employ or discharge any of the hands. My duties were to make up trains, switch trains and do general yard work. I did not have

any power over the other swichmen; they knew their work as well as I did. If I remember right, Mayo had been at work as a switchman there in the yards about thirty days, and he understood his business all right. The car that caused his death was in bad order. It had a 'Bad order' on the side of it. I saw the tag. We have a regular tag or card to mark bad order cars; it is a card about three inches square and tacked on the side of the car. They use these cards instead of chalk, which will wash off. These cards have printed on them the words 'Bad order.' This is the only way the defendant has to designate its bad order cars; that is what they are used for. It is the duty of switchmen to handle bad order cars as well as good order cars when found in the yard, and they do every day."

Jos. Doer, for plaintiff, testified: "In February, 1893, I lived in Cleburne and was in the employe of defendant and had charge of the car department. At that time bad order cars were designated by placing bad order cards on them, the bad order cards are red. In railroad business red indicates danger. I know the car that is said to have mashed Mayo. Just after he was killed I went and took the bad order card off and put another on the car, and that bad order card that was on the car is in my possession. I did not bring it here to court because I did not have time to go by home after it, but the one I have here is just like it, only on that card is the date and number of the car. In other respects they are the same."

Plaintiffs offered in evidence the card brought by Joseph Doer, as follows:

BAD ORDER

Feb. 21/93.

A. L. Whitenack, for plaintiffs, testified: "1 reside in Cleburne, Texas, and did in the month of February, 1893; was working for the defendant, running a switch engine, and was working in that capacity on the day that Mayo was killed, but I was not present when he was killed. I was on my engine about twenty car lengths from him. I was on my engine and was not aware that a man was killed until some little time afterward. I was running switch engine No. 297. Can't say

what I was doing at the time Mayo was killed.   I worked by signals altogether.   I was on the engine obeying signals.   I had known Mayo a week or two before he was killed.   I should judge that he was between twenty-seven and twenty-eight years old, and weighed about 150 pounds. As far as I know he was sound and hearty.   Mayo seemed to be industrious and sober.   His wages were at the rate of about $85 per month. It was usually necessary that the cars switched on No. 2 track should be coupled.   Long strings of cars are not left standing uncoupled except where there is a road crossing.   I know nothing about the car that killed him, as I worked by signals.   Bad order cars are supposed to be repaired before loaded; these must have been damaged while loading. Bad order cards are not left on cars after they are repaired.   A diamond shaped red card with printed letters is tacked on cars to indicate bad order.   Switchmen are supposed to make couplings whether the cars are in good order or bad order, if the couplings or drawheads are all right.   Bad order cars are frequently moved for different purposes, and this cannot be done unless the switchman or someone else couples them up.   I did not know the condition of the two cars."

John Stanton, for plaintiff, testified by deposition:   "In February, 1893, I resided in Cleburne, and was partly acquainted with Harvey A. Mayo.   I was not present when he was killed.   He was dead when I got to him; was crushed between two loaded flat cars.   We were switching sand in on No. 2 stock track for section men to unload.   We cut eight cars off from the engine onto No. 2 track.   Mayo went to make the coupling between the eighth and ninth cars; the drawbar of the eighth car dropped down on the ground and let the drawbar of the ninth car go between draft timbers of the eighth car, and that caused the two cars to come so near together as to crush him to death.   He was standing up when we found him, but was dead.   The eighth car was in bad order.   The draft timbers that caught Mayo were broken and the drawhead in bad shape.   I went to uncouple a car about ten minutes before Mayo was killed, and the back of drawbar run up against the dead-wood and came near catching my thumb.   Mayo was standing on the opposite side of the car at the time.   I told him if he had to make that coupling to look out for it, for it was in bad shape.   Mayo was caught about ten minutes after this.   Such defects were not open and in full view of any one who would go between the cars unless their attention was called to it. · I do not know whether the said car was marked in any way to indicate bad order or not.   I do not know how much experience Mayo had as a switchman; he seemed to understand his business; the duties of a switchman are to couple and uncouple cars. I don't think there was any one present when Mayo was killed.   When a car is reported out of repair they are merely marked 'Bad order,' with a card tacked on side with words 'Bad order' thereon.   I do not know whether the cars or either of them between which Mayo was killed were so marked or not.   Mayo was receiving $85 per month at the time of his death.   He seemed to be an experienced switchman.   I saw the cars

that mashed him about five or ten minutes before he was killed. I never noticed the defects but one time, as before stated. I do not know whether the cars were loaded or not. It was his duty to couple and uncouple bad order cars as well as good order cars. It was usual for long strings of cars to be left standing uncoupled. I noticed the bad condition of the car when I went to uncouple it. I did not see any 'Bad order' card on it. They were apparently all right when standing still, but when the slack run up on them I could see there was something wrong. I saw it about ten minutes before Mayo was killed. If a car is marked 'Bad order,' the employe usually examines it carefully; the employe looks out for defects which are calculated to endanger his life. The man who inspects looks out for all defects. I do not know whether Mayo saw any bad order marks or not. I know that I told him to look out for that car; it was in bad order. He was standing in about four feet of me when I told him; he made no reply; he might not have heard me. I just told him to look out for that car if he had to couple it. I pointed it out to the foreman as he went by, and told him that the draft timbers were all broken. When I discovered the defects I was on the middle of the track pulling the pin, and Mayo was on the opposite side of the track about four feet from me."

Joseph Doer, for plaintiff, testified by deposition: "I resided in Cleburne, Texas, on February 22, 1893. Was not acquainted with Mayo. I saw a dead body they told me was Mayo in the yard. I was not present when he died. Two cars were pointed out to me as the ones that killed Mayo. One of the cars had the 'Bad order' card on it, and it was pointed out to me. The number was 497, and I think it was loaded with sand. This car had the following defects: One lug, three bolts, one lug strap, two lug strap bolts gone, top side bearing gone, one stake pocket broke. This car was marked 'Bad order' on the night of the 21st, and reported so by a tag placed on it. When I reached the place of the accident the drawhead belonging to this car was knocked out. The other car was all right. I do not know that Mayo knew the defects. They were not really in plain view, because they were between the draft timbers. This car was marked 'Bad order' by having a bad order tag placed on it. This card was bright red; the words were printed, and the card was on the side of the car; all cars are marked this way when in bad order. I am, and was, foreman of the car department at Cleburne, Texas. I think the cars were loaded with sand. The card does not say what the defect is, only that it is in bad order. I did not see the cars until after Mayo was killed. You can have a better idea of cars by examining them than by a casual glance. It is customary to move bad order cars from one track to another for the purpose of unloading."

Chas. Warren, witness for plaintiffs, testified by deposition: "I lived in Cleburne, Texas, and was working for defendant as a switchman in its yards at Cleburne on February 22, 1893. I was slightly acquainted with Mayo. He died on stock track No. 2 in Cleburne,

Texas, February 22, 1893. I was not present when he died. I suppose he was crushed to death between two cars. I was switching cars at stock pen north of there. While pulling off the main stock track lead about fifteen cars, we kicked about six or eight cars on stock track No. 2, and Mayo started to make the coupling between two cars which were in bad order. One drawhead being much lower than the other, one drawhead went down, which caused both cars to come together, which caused Mayo's death. The cars were in bad order; one drawhead was hanging down. I do not know whether Mayo knew of the defects in the car or not. Those persons who had any knowledge of handling cars would notice such defects; others would not. Both cars were marked with chalk, 'Bad order,' and also had a card tacked on them with the words 'Bad order.' Mayo seemed to be an experienced switchman. He had been switching to my knowledge about two months. A switchman's duty is to cut off cars, ride cars, couple and uncouple them and place them. There was no one present when Mayo was killed. They have men for the purpose of inspecting cars; when they find one out of order there is a chalk mark placed on it; also a card tacked on it with the words 'Bad order' printed on it. One of the cars between which Mayo was caught was so marked. As long as I knew Mayo he was industrious and sober, and he was getting about $85 per month. I saw Mayo about five minutes before he was crushed. The cars were loaded with sand and were taken on stock track No. 2 to be unloaded. Cars are generally coupled when they are in good order; when they are in bad order, they are generally left uncoupled. I just noticed the bad order card on the car. You could not tell from the card what was the matter unless you noticed the defect. The defect was apparent on account of the drawhead hanging down. While shoving cars in side track No. 2, I noticed the drawhead hanging down as it went by, as I was standing to throw the switch. Yes, there is a difference between looking particularly for defects and looking casually at it passing. Yes, it is customary to load cars as these were and to remove them on another track to unload. It is not a fact that bad order cards or chalk marks are frequently left on cars after they are repaired. I do not know whether Mayo knew of the defects or not. I knew nothing about the condition of the cars."

C. A. Jarrett for plaintiff, testified by deposition: "I resided at Cleburne, Texas, in February, 1893, and was in employ of defendant as switchman. I was acqainted with Harvey A. Mayo. He died in the yards of the defendant in Cleburne, February 22, 1893. I was not present when he was killed. He was instantly killed by being crushed between two flat cars. We were switching in the north part of the yard, and cut off five cars and gave them a little shove upon track No. 3, and Mayo went in to make a coupling and got caught between two cars. They were in bad order. Of the north car of the five that was cut off from the engine, both draft timbers were broken. Both of the cars that he was between were in bad repair. Both draft timbers

of one of the cars were broken; can't say what was wrong with the other. It had a red tag on it used for designating bad order cars. Harvey A. Mayo knew it was in bad order at the time he went to make the coupling; we were looking at the car before we ever pulled them out of the side track; he pulled a pin right behind that car. A man by the name of Stanton told him to look out for that car it was in bad shape. When he pulled the pin the defect was in open view for any one looking at it. There is a red card tacked on the end of cars to indicate bad order. One of these red cards was tacked on each of the cars that Mayo went in between. Mayo was an experienced switchman; when he was killed he had been switching at Cleburne for about one month. I saw Mayo about five minutes before he was killed. I am not at present employed by the defendant. Knew Mayo about thirty days; he was in good health and was sober, etc. I saw the cars that killed Mayo about thirty minutes before he was killed; did not notice them much; they were loaded with sand and were being moved to be unloaded. Mayo was in the discharge of his duty when he was killed, but he was not compelled to push himself in any danger. Sometimes large strings of cars are left uncoupled when we are switching in the yards. I did not make a personal examination of the broken car that killed Mayo, but the broken part was in full view and I saw the defects; also saw the cards on this one and the other, but in the other I saw no defect, nothing but the card, and from that I could not tell what the defects were. Bad order cards are taken off when cars are repaired. It is customary to remove loaded cars to unload them. Mayo was standing looking at the defects in the car that mashed him before he pulled them out of the siding; can't say whether he saw the card or not. I did not see him (Mayo) look at the defects in these cars any more than as heretofore stated. When he pulled the pin behind this I did not hear him told to look out for the cars between which he was killed. I did not tell him anything. I was foreman of the switch crew on that date; the foreman has charge of all the work in the yard, and the men generally work under him; the foreman directs the crew, Mayo was working in the crew of which I was foreman, I gave and he received orders and instructions from me; he obeyed such orders as I gave, and was killed while discharging his duties."

H. L. Preston, for plaintiff, testified by deposition: "I am, and was station agent of the defendant at Cleburne, Texas, on February 22, 1893, and was acquainted with Harvey A. Mayo who died in the yards at that time, but was not present. Mayo was working in the capacity of switchman; he had been in the employment of the defendant for one month; his duties were to couple and uncouple cars, make up trains, etc. When a car is reported 'Bad order,' it is customary to require those in that department to designate the same by tacking a 'Bad order' card on the cars needing it. I am station master for defendant at Cleburne, I had known Mayo about one month; he appeared to be sober,

sound, etc.   He received about 25 cents per hour for eleven hours; perhaps $2.75 per day.   It is the rule of the company that the bad order cards be removed from cars when repaired; as to its being done, I cannot say."

J. D. Harris, for plaintiff, testified by deposition: "I was on switch engine at time Mayo was killed, and was about ten car. lengths from him, was not looking that way, and do not know how he was killed.   Whitenack was engineer, and as far as I know was handling the engine properly."

N. P. Cothran, for plaintiff, testified:   "The cars that mashed Mayo were brought into the yard on the 21st day of February, 1893, at 10 o'clock, which was the day before Mayo was killed.   They came from Meredith, and were loaded with sand."

Here plaintiffs closed their case, and defendant also closed, without introducing any evidence.

*Opinion.*—The assignments of error presented by appellant raise the question of the sufficiency of the evidence to support the verdict and judgment.   It is clear from the evidence that the deceased was a switch- man in the employ of appellant in its yards at Cleburne.   That it was his duty as such to couple and uncouple cars whether they were in good repair or bad repair.   The drawhead of the car by which he was killed was out of order, and he had notice of that fact, and while. attempting to couple it to another car the accident occurred.   It is true the evidence shows that the agents of the appellant had knowledge of the bad condition of the car, and had posted upon it a large red card marked, "Bad order," which was appellant's usual method of notifying its employes of the bad condition of cars.   This car was also marked with chalk, "Bad order," and the deceased was told of its bad condition before the injury.   It further appears that this was a flat car loaded with sand which had been brought the day before from Meredith, and when the injury occurred it was being carried to a convenient place to be unloaded.   It does not appear how long the drawhead had been out of repair or how long the appellant's agents had known of its condition.   It was customary to remove defective or damaged cars for the purpose of unloading them.   The deceased was an experienced railroad man and was familiar with the rules and customs of the company. and assumed the ordinary risks of his employment.   The testimony does not show that the deceased met his death by reason of any negligence on the part of the appellant, and the court erred in refusing to grant its motion for a new trial upon that ground.   Watson v. Railway, 58 Texas, 434; Robinson v. Railway, 46 Texas, 540; Railway v. French, 86 Texas, 96; Railway v. Somers, 71 Texas, 700; 78 Texas, 439; Railway v. Brentford, 79 Texas, 619; Rogers v. Railway, 76 Texas, 502.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*